***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission MODIFIES and AFFIRMS the Opinion and Award of Deputy Commissioner Dollar and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing before Deputy Commissioner Dollar as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Zenith Insurance Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $354.36, which was sufficient to yield a compensation rate of $236.32 per week.
5. By I.C. Form 63 filed on or about February 7, 2002, defendants gave notice of payment of compensation without prejudice to the employee for an injury suffered on January 24, 2002. Defendants paid plaintiff weekly benefits at the rate of $236.32 per week from January 29, 2002 and continuing.
6. The following evidence was entered into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit 1 — I.C. forms and pleadings
b. Stipulated Exhibit 2 — Medical records, 85 pages
c. Defendants' Exhibit 1 — Responses to interrogatories
d. Defendants' Exhibit 2 — Release to light duty
e. Defendants' Exhibit 3 — Letter to plaintiff from Ms. Harkness
 f. Defendants' Exhibit 4 — Letter to plaintiff from Mr. McIntyre dated April 3, 2002 with Dr. Williamson's return to work release attached
7. The issues before the Commission are whether plaintiff is entitled to additional medical treatment; was plaintiff disabled, within the meaning of the Act, after March 18, 2002, and, if so, was the disability proximately caused by the January 24, 2002 injury; should plaintiff be ordered to pay back to defendants all weekly benefits she has received since March 18, 2002; in the alternative, what is the amount of credit defendants are entitled to receive; and is plaintiff entitled to any other benefits under the Act as a result of the January 24, 2002 injury.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty-three year old high school graduate. She has prior experience as a production worker at a footwear factory, as a self-employed housekeeper, and as a daycare worker at childcare centers. Plaintiff completed her Associate Degree in early childhood education in 1999 at Wilkes Community College.
2. Since approximately 1993, plaintiff has received chiropractic and medical treatment for neck and arm pain with numbness in her fingers as the result of injuries she sustained in a motor vehicle accident. Dr. Irving Scherer, her family doctor, diagnosed her with arthritis of the neck in 1994, and he has provided ongoing medical treatment for this condition.
3. In mid 1999, plaintiff began working as a part-time daycare assistant at defendants' Child Development Center (hereafter "The Center"). The Center is a five-star professional childcare facility which also serves as a training center for students in the early childhood development curriculum. It has approximately 120 students, ranging from six weeks to five years of age, and employs fifty full-time employees. In addition, the Center has students working on a part-time basis through the early childhood curriculum. At the Center, children are divided by ages and placed in classes of ten children. Each class has a lead teacher and an assistant. As a five-star facility, the Center maintains a ratio of five children to one teacher.
4. In 2001 and 2002, plaintiff was under the care of her family doctor for headaches, anxiety and depression. Her psychological conditions became worse in July of 2001, after a man she identified as her husband was sent to prison. At the hearing before the Deputy Commissioner, plaintiff clarified that she was never married to the man who was incarcerated, but rather had been involved in a long-term relationship with him at the time of his incarceration.
5. On January 24, 2002, plaintiff was working full-time as a lead teacher in a toddler class. The children in this class were between twelve and twenty-four months in age. Plaintiff had one full-time assistant, as well as a third adult assistant in the afternoon hours.
6. Plaintiff worked from 7:30 a.m. to 3:30 p.m. She supervised, monitored, taught, read and played with the children. She was also responsible for completing paperwork. Plaintiff helped serve meals, prepared lesson plans, changed diapers and lifted the toddlers in her class.
7. On January 24, 2002, plaintiff slipped in liquid as she was cleaning it from the floor in the classroom. She felt pain in her leg and groin area. Plaintiff reported the injury to Wilma Cockerham, the Center's secretary, and to the Center Director, Eva Harkness. Plaintiff declined medical treatment and completed the remainder of her shift. Ms. Cockerham and Ms. Harkness advised plaintiff that she would have to follow procedures and fill out proper paperwork if medical treatment was necessary.
8. Plaintiff reported to work the following day. However, she remained seated most of the day due to discomfort in her neck and groin. Her assistants did any lifting that was necessary during that day.
9. On January 29, 2002, plaintiff did not report to work. She sought treatment from Dr. Scherer for neck and back pain. He diagnosed plaintiff with low back muscle strain and authorized her to remain out of work until February 13, 2002. Plaintiff did not request authorization from her employer before seeking this treatment and did not follow the instructions that were outlined for her. Nevertheless, defendants paid for the treatment. Plaintiff's x-rays taken on January 30, 2002 were normal.
10. On February 5, 2002, plaintiff went to the emergency room at Davis Hospital where she sought treatment for neck pain and low back pain radiating into her right leg and foot. She was referred to orthopedist Dr. Mark B. Williamson for follow-up.
12. Plaintiff sought treatment from Dr. Williamson in Statesville on February 11, 2002 for right-sided pain. Plaintiff did not inform Dr. Williamson of her pre-existing back and neck problems since 1993 for which she had received treatment and chiropractic adjustments. Following a physical examination, Dr. Williamson diagnosed plaintiff with enthesopathy and muscoloskeletal strain. A bone scan was ordered to rule out occult fracture. Dr. Williamson released plaintiff to return to a sitting-only position, pending testing. In a February 13, 2002 letter, Dr. Williamson stated that plaintiff could return to work at the Center in her supervisory capacity, seated in a rocking chair.
13. On February 14, 2002, Ms. Harkness sent plaintiff a letter, stating the employer was able to accommodate Dr. Williamson's restrictions, and they would expect her to report to work on February 15, 2002. However, plaintiff did not report to work on February 15, 2002.
14. On February 20, 2002, plaintiff sought to have Dr. Scherer write her out of work. Although Dr. Scherer knew that plaintiff had been treated by Dr. Williamson, plaintiff did not inform Dr. Scherer that Dr. Williamson had authorized her to return to work as of February 11, 2002 in a limited capacity, or that defendants had offered work within Dr. Williamson's restrictions. Dr. Scherer excused plaintiff from work until March 4, 2002.
15. After February 20, 2002, plaintiff's husband contacted Dr. Williamson's office on plaintiff's behalf a number of times, requesting an out-of-work note. Dr. Williamson agreed to write plaintiff out of work pending the bone scan. Plaintiff's February 25, 2002 full body bone scan showed no abnormalities in the cervical or lumbar spine.
16. Plaintiff returned to Dr. Williamson on March 18, 2002, at which time he found she had fully recovered from the January 24, 2002 injury. Dr. Williamson diagnosed plaintiff with fibromyalgia which was unrelated to the January 24, 2002 injury. He released her to return to full duty work.
17. After the full duty release, plaintiff did not contact defendants to return to work.
18. By letter dated April 3, 2002, employer's Human Resources Director Tracy McIntire informed plaintiff they were holding her job and requested she return to work. Plaintiff did not reply to this letter either in writing or by telephone.
19. On April 24, 2002 defendants filed a Form 24 Application to Terminate Compensation which was subsequently denied by the Industrial Commission by Order dated June 4, 2002.
20. On April 23, 2002, plaintiff sought treatment from general surgeon Dr. Jerry Watson. Based on her complaints, Dr. Watson diagnosed plaintiff with an acute cervical strain with right brachial radiculopathy and an acute lumbosacral strain with right sciatica. Dr. Watson ordered cervical and lumbar MRIs. The lumbar MRI showed mild degenerative disc disease and no herniation or spinal stenosis. The cervical MRI revealed degenerative changes at C4-5 and C5-6 with a spur at C5-6. Dr. Watson referred her to neurosurgeon Dr. David Kelly. Dr. Watson did not authorize plaintiff to remain out of work. Plaintiff did not inform Dr. Watson that Dr. Williamson had released her to return to work and that defendants had offered her a sedentary job with alternating sitting and standing and no lifting. In his deposition, Dr. Watson stated that he would have allowed plaintiff to try this work, but not at times when she had acute flare-ups of pain.
21. On June 27, 2002 Dr. Kelly reviewed the MRIs and examined plaintiff. He found plaintiff was not a surgical candidate. Dr. Kelly released plaintiff from his care and referred her back to Dr. Watson for possible referral to physical therapy.
22. Dr. Kelly testified that had he been aware of the light duty release by Dr. Williamson and defendants' offer of the light-duty supervisory position, he also would have permitted plaintiff to return to light duty employment.
23. On July 19, 2002, plaintiff returned to Dr. Watson and reported that her symptoms were worse. Dr. Watson prescribed pain medications and muscle relaxants.
24. Plaintiff subsequently returned to Dr. Williamson, who reviewed the MRIs and found no dermatomal consistency to her symptom complex and no objective findings consistent with a musculoskeletal injury of significance. Dr. Williamson again found that plaintiff was fully recovered from the injury of January 24, 2002 and that she had no permanent functional impairment to her back as the result of her injury.
25. In August 2002, plaintiff returned to Dr. Watson with increased pain symptoms. Dr. Watson again referred her to Dr. Kelly because he was concerned that her condition was a neurosurgical or orthopedic surgical issue which was beyond his expertise.
26. On January 16, 2003, plaintiff sought treatment with Dr. Kelly. A course of steroids and traction was ordered for her neck. On March 10, 2003, Dr. Kelly reviewed the December 30, 2002 cervical MRI which showed no changes from the prior MRI. Dr. Kelly did not discuss a possible return to work with plaintiff.
27. Following the Deputy Commissioner hearing, after the April 14, 2003 appointment Dr. Kelly ordered another lumbar MRI due to plaintiff's back complaints. The April 22, 2003 MRI showed only degenerative disc disease, but no other changes. Again, Dr. Kelly had no recommendation for surgery or additional treatment. He did not discuss return-to-work issues with plaintiff.
28. Despite being released to limited and regular duty by Dr. Williamson, plaintiff refused to attempt to return to work. Plaintiff testified at the Deputy Commissioner hearing that she did not return to work out of concern for the children who would have been upset that she was unable to lift them. Ms. Harkness, however, testified that as lead teacher plaintiff would have been able to sit and direct other employees to perform the lifting.
29. Plaintiff reached maximum medical improvement from the January 24, 2002 injury by March 18, 2002. She continues to experience chronic pain for which she needs additional medical treatment.
30. The Full Commission gives greater weight to the expert opinions of Dr. Williamson, who had an opportunity to treat plaintiff during the weeks immediately following the injury by accident, than to Dr. Kelly and Dr. Watson who treated plaintiff months after her injury.
31. Plaintiff has been released to and is capable of returning to at least light duty work with defendant-employer, who has offered suitable light duty work since March 18, 2002. The lead teacher position offered by defendants was within plaintiff's physical restrictions and was not so modified by the provision of lifting assistance as to affect the essential job functions of the position.
32. The Full Commission finds by the greater weight of the credible evidence that plaintiff's refusal to accept suitable work tendered by her employer was not justified.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 24, 2002 plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Defendants admitted the compensability of plaintiff's injury by filing a Form 63 and have continued to pay compensation to plaintiff through the present.
2. N.C. Gen. Stat. § 97-32 provides: "If an injured employee refuses employment procured for him suitable to his capacity he shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Industrial Commission such refusal was justified." In the instant case, plaintiff's refusal to accept suitable work offered by her employer was not justified. Therefore, she is not entitled to additional benefits under the Act so long as she continues to refuse the suitable work defendants have offered her. Id.
3. Defendants are entitled to a credit for benefits paid to plaintiff after March 18, 2002 which shall be applied to any future benefits due and payable to plaintiff. N.C. Gen. Stat. §97-42.
4. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury by accident. N.C. Gen. Stat. § 97-25.
5. Although Dr. Williamson believed that plaintiff retained no permanent functional impairment to her back, the evidence of record does not include any second opinion from another medical expert as to any possible impairment rating, to which plaintiff is entitled pursuant to N.C. Gen. Stat. § 97-27(b).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants are authorized to suspend benefits to plaintiff, effective March 18, 2002, until plaintiff ceases to refuse employment procured for her that is suitable to her capacity. Defendants shall receive a credit for compensation paid plaintiff after March 18, 2002 which shall be applied to any future compensation due and payable to plaintiff.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable injury by accident.
3. The issue of any permanent functional impairment to plaintiff's back as a result of the compensable injury by accident is reserved for decision, pending further medical evaluation. In the event the parties are unable to stipulate to a rating, either party may file a Form 33 Request for Hearing.
4. If not already paid, defendants shall pay expert witness fees of $400.00 to Dr. Kelly, $240.00 to Dr. Watson, and $320.00 to Dr. Williamson.
5. Each side shall pay its own costs.
This the ___ day of August, 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd